**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MARY E. HILL, )<br>    Plaintiff, )<br>        v. )<br>MICHAEL J. ASTRUE, )<br>Commissioner of Social Security, )<br>    Defendant. ) | Civil Action No. 08-151 Erie |

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., J.

      Plaintiff, Mary E. Hill, commenced the instant action pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final decision of the Commissioner of Social Security denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq*. Plaintiff filed an application for DIB on June 7, 2005, alleging disability since December 13, 2004, due to glaucoma and minor cataracts (Administrative Record, hereinafter "AR", 72). Her application was denied and she requested a hearing before an administrative law judge (hereinafter "ALJ") (AR 53; 54-57). Following a hearing held on September 19, 2007, the ALJ found that Plaintiff was not entitled to disability insurance under the Act (AR 11-22; 264-91). Plaintiff requested review by the Appeals Council and, after accepting and considering additional evidence, the Appeals Council denied her request for review (AR 10; 9; 6-8), rendering the Commissioner's decision final under 42 U.S.C. § 405(g). The instant action challenges the ALJ's decision. Presently pending before the Court are cross-motions for summary judgment. For the reasons set forth below, I will deny the Plaintiff's motion and grant the Defendant's motion.

### I. BACKGROUND

      Plaintiff was born on March 27, 1956 and was fifty-one years old on the date of the ALJ's decision (AR 66; 11-22). Historically, the Plaintiff was born Triva Marlene McMahon and was placed in Saint Joseph's Home for Children in Erie, Pennsylvania (AR 192). Records from Saint Joseph's and Saint Vincent's Hospital in Erie reveal that Plaintiff's family history was significant

for Huntington's Chorea (AR 192; 194). As an infant, Plaintiff was unable to sit up or straighten her legs, and she was considered mentally challenged (AR 192-94). A chest x-ray performed on January 14, 1957 revealed an unusual configuration of the heart, with extreme prominence of the left upper cardiac border detected (AR 193). A skull x-ray of even date disclosed flattening of the anterior fossa and an unusually thick frontal bone, with no evidence of increased intracranial pressure (*Id.*). Murl E. Kinal, M.D., reported on January 17, 1957 that Plaintiff, as a baby, appeared mentally challenged, suffered seizures, and had neurologic retardation resulting from her family history of Huntington's Chorea (AR 194).

Notwithstanding these early notations in the record, Plaintiff graduated from high school, had four or more years of college, and additionally had some type of special job training, trade, or vocational school (AR 77). Her past relevant work experience was as a newspaper reporter for approximately sixteen years (AR 21; 83-90). She has not engaged in substantial gainful activity since December 13, 2004 (AR 83).

Plaintiff was diagnosed with chronic angle closure glaucoma in the left eye by Subramamyam Segu, M.D., on October 17, 2003 and underwent a left eye YAG laser iridotomy on that date (AR 111-15). Dr. Segu treated Plaintiff every four months from October 15, 2003 until August 17, 2006, and on June 23, 2005, he noted that Plaintiff suffered from chronic angle closure glaucoma, optic atrophy with extensive visual field loss and mild cataracts (AR 117-29). On September 26, 2005, Dr. Segu reported that Plaintiff had blurred vision in the left eye (AR 125). Dr. Segu again noted on April 19, 2006 severe visual field loss of the left eye and mild cataracts (AR 124).

In addition to Dr. Segu, Plaintiff was also treated by opthamologist Perry Younger, M.D., who continuously noted a worsening condition in her left eye with decreased visual field, difficulty seeing small print, severe visual field loss, decreased vision and increased pressure between October 2003 and August 2007 (AR 131-48; 204-7).

Following her termination from the newspaper, the Plaintiff was eligible to receive services from the Office of Vocational Rehabilitation (hereinafter "OVR") (AR 195-98). Her Vocational Rehabilitation Counselor, Christopher M. Cowan, M.A., C.R.C., L.P.C., stated that

her visual impairment was a substantial impediment to employment, but that she could benefit by receiving OVR's services to secure other employment (AR 195). Mr. Cowan further determined that Plaintiff was "most severely disabled" due to functional limitations in physical mobility, dexterity and coordination, physical tolerance, capacity to learn, communication, and self-direction (*Id.*). Mr. Cowan noted on February 3, 2006 that Plaintiff was interested in securing a job as a medical transcriptionist, for which she was to begin training (AR 197).

Plaintiff's primary care physician, Richard Reist, M.D., treated her for a urinary tract infection, right hip pain, asthma with allergies, glaucoma and bilateral cataracts between September 2006 and May 2007 (AR 150-74). Dr. Reist noted that Plaintiff had an excellent exercise tolerance and a normal psychiatric evaluation (AR 150). He diagnosed Plaintiff with fibroid uterus tumor and uterine myoma resulting in abnormal uterine bleeding, urinary frequency, stress incontinence, bladder compression with right hip pain, boney spurring of the greater trochanter and mild degenerative joint disease of the right hip (AR 156-58).

On May 24, 2007, Plaintiff endured hysterectomy surgery resulting in post-surgical diagnoses of fallopian tube cysts, chronic cystic cervicitis with squamous metoplasia, atrophic change of the endometrium, multiple intermural leiomyomas and a large leiomyoma with cystic degeneration (AR 161-62).

The Tidioute Health Center treatment notes of record revealed that Plaintiff was seen for intermittent abdominal pain resulting from her hysterectomy on September 21, 2007 (AR 211). The report also noted hot flashes, lower back pain and glaucoma, and referrals to a clinical psychologist for neuro-psychological testing, as well as a physiatrist, pursuant to the Plaintiff's request (*Id.*). She was diagnosed with asthma, cataracts and glaucoma (AR 211-14).

Plaintiff was evaluated by Garrett W. Dixon, M.D., a board certified physiatrist, on October 9, 2007 (AR 238-39). Plaintiff reported a history of low back and right hip pain (AR 238). Dr. Dixon noted that she received no treatment for her low back pain and that she took over-the-counter Tylenol or Aleve for the pain (*Id.*). Plaintiff disclosed to Dr. Dixon that her pain increased with sustained activity, and that at times the pain radiated into her legs (*Id.*). Plaintiff also revealed that she was able to perform some household chores, including light

cleaning, walking her dogs, laundry and dishes, although she needed a break every eight to ten minutes while doing dishes (*Id.*). Dr. Dixon noted that Plaintiff alternated between sitting and standing during the examination, had a stooped posture with a mild thoracic kypnosis and fairly rigid spine, and a slightly flexed posture when walking (*Id.*). Dr. Dixon observed a straightening of the normal lumbar lordosis, lower lumbar paraspinal tenderness bilaterally, and right lumbar paraspinal spasm (AR 239). He diagnosed her with low back pain and lumbar osteoarthritis (*Id.*).

Subsequent x-rays of the Plaintiff's lumbar spine taken on October 10, 2007, indicated minimal scoleosis with concavity towards the left, mild facet hypertrophy along the lower lumbar vertebral bodies, 1-2 mm of anterolisthesis of L3 versus L4 and 2-3 mm of anterolisthesis of L4 versus L5, no evidence of fractures, and mild marginal bony spurring (AR 235). The impression from this report was degenerative changes with minimal anterolisthesis at L3-L4 and L4-L5 (AR 236).

Plaintiff and Sam Edelmann, a vocational expert, testified at the hearing held by the ALJ on September 19, 2007 (AR 264-91). Plaintiff testified that, following her termination from the newspaper, she had worked a part-time job at a call-center for three months, but was not asked to continue in the position once the term expired due to too many bathroom breaks (AR 270-71). She also received unemployment compensation for a time following her termination (AR 269-70). Plaintiff also stated her glaucoma caused significant problems driving (AR 274).

Plaintiff testified that she had difficulty performing her duties as a reporter at the newspaper prior to her termination in that she was unable to complete her work in a timely fashion due to the stress of the job, her slow brain functioning and distractability (AR 275-76). She revealed that she was disciplined at work for her performance problems (AR 276).

Plaintiff claimed that she could not perform full-time work due to her visual limitations, eye pain and lower back pain (AR 279). She indicated that she had worked with the Office of Vocational Rehabilitation and was found to have problems with speed and coordination, as well as physical tolerance and sustaining activity (AR 279-81).

Plaintiff stated that her activities of daily living included doing housework as she was able (AR 280). She claimed she was unable to lift more than five pounds, was unable to safely

handle objects and bumped into things (AR 280). Plaintiff also testified that she experienced distraction, confusion and fatigue in her daily living (AR 281-82).

Plaintiff further testified that she had urinary difficulties for the previous five years, which became more frequent following her hysterectomy surgery (AR-252-54). She also suffered from gynecological problems (AR 282-83).

Plaintiff indicated that she had problems with dexterity, was slow in performing activities and was easily distracted (AR 284-85). She accredited her slowness to both her physical and mental difficulties (AR 285). She claimed she had difficulty thinking of the right words, tended to over explain, and often needed simple things explained to her when communicating (AR 285-86).

The vocational expert testified that Plaintiff's past work experience as a newspaper reporter was light and skilled, her position at the call center was sedentary and semi-skilled, and a position she had as a mental retardation teaching aid was light and semi-skilled (AR 286). The ALJ then asked the vocational expert to assume an individual of the same age, education, and work experience as Plaintiff, who was capable of light work activity in which she would be in relatively close proximity to restroom facilities, unable to work at unprotected heights or around dangerous machinery, unable to engage in climbing or balancing as an integral part of the job, and in an environment that did not require high quotas or close attention to quality production standards (AR 286-87). The vocational expert testified that, given those limitations, Plaintiff could return to her teaching aid position, but not to the newspaper or call center positions (AR 287). Furthermore, the vocational expert identified other jobs existing in significant number in the national economy that such a hypothetical individual could perform, which consisted of cashier, ticket sales, and sales attendant (AR 287). Additionally, the vocational expert identified jobs that such a hypothetical individual could perform at the sedentary level as receptionist and cashier (AR 288). The vocational expert also testified that an employer would not tolerate three or more absences per month for several months or an employee who would be off task ten to fifteen percent of the workday, excluding the usually scheduled breaks and lunch periods, for an extended period of time (AR 288-89).

Post hearing, Plaintiff was examined by William J. Fernan, Ph.D., a licensed psychologist, on November 2, 2007, upon referral by Plaintiff's counsel (AR 241-48). Plaintiff reported to Dr. Fernan that she graduated from McDowell High School in Erie, Pennsylvania in 1975, having received learning support in all of her subjects, achieving poor grades, including failing the fourth grade (AR 241). Plaintiff also revealed she was constantly picked on by peers and had few friends, but related well with her teachers (*Id.*). She graduated from Gannon College with a B.A. in writing (*Id.*).

Plaintiff reported suffering from depression and post-traumatic stress disorder following the death of her first husband, as well as serious cognitive problems, anxiety, and problems thinking and functioning, particularly in the last five years (AR 243). Plaintiff stated that she could complete light household chores, but that it took her a long time, and she was forgetful (*Id.*).

Dr. Fernan administered several tests to Plaintiff, including the Halstead Tests of the Halstead-Reitan Neuropsychological Examination, which indicated that Plaintiff had severe impairment in brain-behavior relationships (AR 243). She tested in the impaired range on six of seven subtests comprising the index, including serious impairments in incidental memory, organizing and planning skills, sustained strength and speed of movement, logic, problem-solving ability, ability for new learning, attention and concentration for both simple and complex auditory tasks, and simple motoric speed bilaterally (*Id.*). Results further indicated Plaintiff had severely impaired speed and flexibility of thinking, ability to deal with sequential material and ability to deal with several concepts simultaneously (*Id.*). She did, however, exhibit good general memory (*Id.*).

Dr. Fernan also administered the Minnesota Multiphasic Personality Inventory-2 to Plaintiff, although Dr. Fernan noted that the profile pattern from the results of the test were of somewhat questionable validity (AR 244). Dr. Fernan concluded, however, that the profile pattern would be seen as being valid, and that Plaintiff displayed very strong subjective feelings of distress and problems interpreting more difficult test items (*Id.*). Plaintiff's profile pattern indicated that she was extremely withdrawn with severe anxiety and depression, harbored anger

and resentment, felt life had been unfair to her, and was likely oversensitive and easily overwhelmed (*Id.*).

Dr. Fernan diagnosed the Plaintiff with dementia NOS, major depressive disorder, recurrent, moderate, anxiety disorder NOS, developmental coordination disorder, and rule out mathematics disorder and learning disorder (*Id.*). He assigned her a current Global Assessment of Functioning score ("GAF")[1] of 50 (AR 245). He found her prognosis was extremely poor, citing her cognitive and personal adjustment difficulties (*Id.*).

Dr. Fernan opined that Plaintiff had a slight limitation in her ability to make judgments on simple work-related decisions; a moderate limitation in her ability to understand and remember short, simple instructions and interact appropriately with supervisors and co-workers; a marked limitation in her ability to carry out short, simple instructions, interact appropriately with the public and respond appropriately to work pressures in a usual work setting; and an extreme limitation in her ability to understand, remember, and carry out detailed instructions and respond appropriately to changes in a routine work setting (AR 246).

Dr. Fernan concluded that the Plaintiff had significant dementia with poor memory, with a high level of forgetfulness, poor organizing and planning skills, and severely impaired logic, problem-solving ability, and ability for new learning (AR 248). Dr. Fernan also indicated that Plaintiff demonstrated impaired attention and concentration, speed and flexibility of thinking, ability to deal with sequential material, ability to deal with several concepts simultaneously, and grossly impaired simple motoric speed bilaterally (*Id.*).

Dr. Fernan observed that Plaintiff lacked self-esteem and confidence, would be easily confused, was withdrawn, and suffered debilitating depression and anxiety (*Id.*). Additionally, he found that the Plaintiff suffered very significant physical problems which further complicated matters (*Id.*).

---

[1] The GAF score considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. It represents "the clinician's judgment of the individual's overall level of functioning." *See Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 32 (4th ed.2000). Scores between 41 and 50 indicate "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e .g., no friends, unable to keep a job)." *Id.* at 34.

The ALJ subsequently issued a written decision which found that the Plaintiff was not entitled to disability insurance within the meaning of the Social Security Act (AR 11-22). Her request for an appeal with the Appeals Council was denied rendering the ALJ's decision the final decision of the Commissioner (AR 6-8). She subsequently filed this action.

## II. STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see Richardson v. Parales*, 402 U.S. 389, 401 (1971). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson*, 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995).

## III. DISCUSSION

Title II of the Social Security Act provides for the payment of disability insurance benefits to those who have contributed to the program and who have become so disabled that they are unable to engage in any substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). In order to be entitled to disability insurance under Title II, a claimant must additionally establish that his or her disability existed before the expiration of his or her insured status. 42 U.S.C. § 423(a), (c); *Matullo v. Bowen*, 926 F.2d 240, 244 (3rd Cir. 1990) (claimant is required to establish that he became disabled prior to the expiration of his insured status); *see also* 20 C.F.R. § 404.131. Plaintiff's insured status will expire on December 31, 2010; therefore she must show that she is disabled on or prior to that date for purposes of entitlement to disability insurance.

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a five-step evaluation process to determine when an

individual meets this definition:

> In the first two steps, the claimant must establish (1) that he is not engaged in "substantial gainful activity" and (2) that he suffers from a severe medical impairment. *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). If the claimant shows a severe medical impairment, the [Commissioner] determines (3) whether the impairment is equivalent to an impairment listed by the [Commissioner] as creating a presumption of disability. *Bowen*, 482 U.S. at 141. If it is not, the claimant bears the burden of showing (4) that the impairment prevents him from performing the work that he has performed in the past. *Id.* If the claimant satisfies this burden, the [Commissioner] must grant the claimant benefits unless the [Commissioner] can demonstrate (5) that there are jobs in the national economy that the claimant can perform. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3rd Cir. 1985).

*Jesurum*, 48 F.3d at 117.

Here, the ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2010, and that she had not engaged in substantial gainful activity since December 13, 2004, the alleged disability onset date (AR 16). The ALJ then found that Plaintiff had the severe impairments of chronic low back and right hip pain associated with degenerative joint disease, glaucoma and cataracts, and possible dementia with depression (*Id.*). At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526) (AR 17). The ALJ found that Plaintiff retained the residual functional capacity to perform light work that would allow close proximity to restroom facilities, would not involve exposure to unprotected heights or dangerous machinery, or climbing and balancing, or high quotas or close attention to quality standards (AR 18). At the fourth step, the ALJ found that Plaintiff was unable to return to any of her past relevant work (AR 21). At the final step, the ALJ concluded that Plaintiff could perform the jobs cited by the vocational expert at the administrative hearing (AR 21-22). The ALJ additionally determined that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible (AR 19). Again, I must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Plaintiff first argues that the ALJ's decision is internally inconsistent and fundamentally flawed because he found that Plaintiff could not perform her past relevant sedentary work as a

reporter, yet was capable of performing and sustaining light work activity. I find no inconsistency. Initially, I note that the vocational expert testified that Plaintiff's past relevant work as a reporter was considered light work, not sedentary, as Plaintiff attests (AR 286). Furthermore, the ALJ did not find that Plaintiff could perform the full range of light work, but that her ability to perform light work was subject to additional limitations (AR 18). Two of those limitations precluded high quotas or close attention to quality standards (*Id.*). Those limitations would prevent Plaintiff from returning to her past relevant work as a reporter. I therefore find that the ALJ's decision is neither internally inconsistent or fundamentally flawed in this regard, but rather is supported by substantial evidence and not unreasonable.

      Plaintiff's second argument is that the ALJ took too narrow a view on her reason for leaving the Erie Times. Specifically, Plaintiff avers that the ALJ failed to acknowledge impairments beyond her visual limitations that were integral in the termination of her employment as a newspaper reporter, including not being able to work rapidly enough, not being able to finish tasks, not being able to perform a sufficient number of required tasks, and not being able to remain focused on her work activity. The ALJ mentions in his decision that "the real reason she stopped working as a newspaper reporter as of the alleged onset date was because of her visual impairment" (AR 19) and that Plaintiff "did not stop working due to the effects of any serious mental impairment, including dementia, but basically because of her visual problems including glaucoma and cataracts" (AR 20) and further "[w]hile the claimant indicated to Dr. Fernan that she has had mental health symptoms for about five years, she continued to perform her regular skilled duties as a newspaper reporter through the end of December 2004, about three years prior to Dr. Fernan's examination." (*Id.*). Plaintiff's position seems to be that this analysis overlooks her testimony that

> . . . basically I couldn't get my work done on time and it was very difficult for me to do that just because I was under the - - under stress of the job, plus just my - - I'm trying to think here what to say, just my slowness basically. My brain, my function as far as brain function was slow, just basically slow. I get easily distracted when I'm sitting.

(AR 275). And further,

> . . . the fact that between having difficulty thinking as far as just the

> thought, my thought processes, as far as trying to type a story in, I was having difficulty with that, trying to get everything. You know trying to get the story and trying to do the multi-tasking, which was hard because we - - I not only did stories, I also took pictures. I - - in our office in Edinboro I had to answer telephone calls. And you know I'd get sidetracked if the phone rang and I'd have to go back and, you know, when you're sidetracked and you're trying to write a story it's rather, it is hard to do because you get sidetracked, then you try and go back to your story and you're looking. And you're like, you're looking at your notes and you're looking at the story and you're thinking, where did I leave off at, you know. And it just, you just lose, I just lost the train of thought basically.

(AR 276-77).

I find the Plaintiff's argument in this respect irrelevant. It would certainly be material had the ALJ determined that the Plaintiff was capable of returning to her past relevant work as a newspaper reporter, but such is not the case here. I find not withstanding Plaintiff's testimony that the ALJ's conclusion that she lost her job at the newspaper primarily due to visual problems is supported by substantial evidence. Even if the ALJ's conclusion was in error it was, under the circumstances, harmless. The ALJ functionally accommodated Plaintiff's contention of her "slowness" in determining Plaintiff's RFC by limiting her to no high quotas or close attention to quality standards. These restrictions were taken into account by the vocational expert in determining that the Plaintiff was capable of performing jobs that exist in significant number in the national economy, upon which basis the ALJ found that Plaintiff was not disabled under the Act.

Additionally, Plaintiff claims that the ALJ erred in not giving substantial weight to the Office of Vocational Rehabilitation's determination that Plaintiff was most severely disabled, nor did he account for the OVR's documented extreme functional limitations with physical mobility, dexterity, coordination, physical tolerance, capacity to learn, communication and self-direction. The ALJ did consider this opinion and assessed less weight to it because the qualifications of the individual rendering the opinion were questionable and another employee of the OVR concluded, about a year later, that Plaintiff's chief impairments related to night driving and driving in the snow. Furthermore, the determination by the OVR lacks clinical or objective findings. "The more a medical source presents relevant evidence to support an opinion, particularly medical

signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion." 20 C.F.R. § 404.1527(d)(3).

In addition, as the Defendant points out, the OVR ultimately concluded that Plaintiff would benefit from vocational rehabilitation services "to re-enter gainful employment" (AR 195). Moreover, the OVR's standard of disability does not mirror that of the Act, and therefore a finding of disability by that agency does not mandate the same finding under the Act. *See* 20 C.F.R. § 404.1504 ("A decision by any non-governmental agency or any other governmental agency about whether you are disabled or blind is based on its rules and is not our decision about whether you are disabled or blind. We must make a disability or blindness determination based on social security law. Therefore, a determination made by another agency that you are disabled or blind is not binding on us."). An opinion that a claimant is "disabled" or "unable to work" is not dispositive or entitled to special deference. *See Adorno v. Shalala*, 40 F.3d 43, 47-48 (3rd Cir. 1994); 20 C.F.R. §§ 404.1527(e), 416.927(e). Disability determinations are the province of the ALJ. 20 C.F.R. § 404.1527(d)(2), 416.927(d)(2). Thus, I find that the ALJ's treatment of this opinion was supported by substantial evidence and not unreasonable.

Plaintiff next contends that the ALJ improperly rejected the objective test-based findings and opinions of Dr. Fernan and that he placed "impermissible weight" on Plaintiff's initial stated reasons for seeking benefits. I disagree.

The ALJ cites to the records of Plaintiff's long-time treating primary care physician, Dr. Reist, which consistently note normal psychiatric functioning (AR 150-52). Likewise, the records from Tidioute Health Center denote normal psychiatric functioning, other than a note referring Plaintiff for neuro-psychological testing (AR 211-14). The ALJ also notes that Plaintiff continued to work after the alleged onset of her mental impairments, and they were not the reason for the cessation of her work activity. Furthermore, the ALJ observes that Plaintiff's social relationships belie a finding that she suffered from such severe limitations. The ALJ further found that Dr. Fernan's report was internally inconsistent, in that the diagnosis of dementia is inconsistent with Dr. Fernan's observation that Plaintiff was able to handle her

finances, read, enjoy television, and perform chores.  In addition, the ALJ concluded that his own observations of Plaintiff's performance at the hearing were inconsistent with the findings of Dr. Fernan relative to severe dementia.  An ALJ may reject the opinion of a physician if it is contrary to other medical evidence contained in the record, *see, e.g., Frankenfield v. Bowen*, 861 F.2d 405, 408 (3rd Cir. 1988), or if it is insufficiently supported by clinical data, *see, e.g., Newhouse v. Heckler*, 753 F.2d 283, 286 (3rd Cir. 1985), or if it is in the form of an unsupported conclusory opinion, *see, e.g., Jones v. Sullivan*, 954 F.2d 125, 129 (3rd Cir. 1991).  The record thus contains substantial evidence upon which the ALJ could reject Dr. Fernan's opinion regarding Plaintiff's mental limitations.

Finally, Plaintiff contends that the ALJ did not sufficiently develop the record to include all of Plaintiff's claimed limitations or engage in a function by function analysis in rendering his RFC determination.  The ALJ may use his discretion, in consultation with medical opinion, to determine residual functional capacity.  *See* 20 C.F.R. §§ 404.1527(e), 416.927(e); Social Security Ruling 96-5p.  The ALJ need only include those limitations which he finds to be credible in his RFC determination.  *See Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000); *see also Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999).  The ALJ assessed Plaintiff's RFC as follows:

> **5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work that would allow close proximity to restroom facilities, and would not involve exposure to unprotected heights or dangerous machinery, or climbing and balancing; or high quotas or close attention to quality standards.**

(AR18).

The crux of Plaintiff's argument on this point is little more than a recapitulation of her attack on the ALJ's analysis of the medical evidence under the previous arguments.  As I have already addressed the sufficiency of the ALJ's treatment of these opinions and found no error, I further find no error in the ALJ's RFC assessment.

## IV. Conclusion

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARY E. HILL, | ) |
|         Plaintiff, | ) |
| | ) Civil Action No. 08-151 Erie |
|         v. | ) |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) |
|         Defendant. | ) |

## ORDER

AND NOW, this 4th day of September, 2009, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Plaintiff's Motion for Summary Judgment [Doc. No. 9] is DENIED, and the Defendant's Motion for Summary Judgment [Doc. No. 12] is GRANTED.  JUDGMENT is hereby entered in favor of Defendant, Michael J. Astrue, Commissioner of Social Security, and against Plaintiff, Mary E. Hill.

The clerk is directed to mark the case closed.


                                          s/ Sean J. McLaughlin
                                          United States District Judge

cm: All parties of record.